**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**GLEN JARVIS,**

                    **Plaintiff,**

**-vs-**                                              **Case No.  6:05-cv-503-Orl-JGG**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL**
**SECURITY,**

                    **Defendant.**
_____

## MEMORANDUM OF DECISION

        Plaintiff Glen Jarvis ["Jarvis"] appeals to the district court from a final decision of the

Commissioner of Social Security [the "Commissioner"] denying his application for a period of

disability and disability insurance benefits.  *See* Docket No. 1 (complaint).  For the reasons set forth

below, the Commissioner's decision is **REMANDED**.

## I.    PROCEDURAL HISTORY

        On June 6, 2002, Jarvis filed a claim for disability insurance benefits.  R. 50.  Jarvis claims

disability as of March 2, 2002 due to a spinal cord infarction with partial paraplegia and diminished

functioning of his lower extremities.  R. 55.  His claim was denied initially, and upon reconsideration.

R. 33, 36.  On June 16, 2004, the Honorable Theodore Haynes, Administrative Law Judge ["ALJ"],

held a thirty-five minute hearing on Jarvis' claim in Orlando, Florida.  R. 252 - 86.  Attorneys Carlos

Fournier and Francisco Gonzales represented Jarvis at the hearing.  R. 21, 252, 255.  The ALJ heard

testimony from Jarvis and Walter Todorowski, a vocational expert ["VE"].

On September 24, 2004, the ALJ issued a decision that Jarvis was not disabled and not entitled to benefits. R. 19. Following a review of the medical and other record evidence, the ALJ found that Jarvis could not perform his past relevant work as a truck mechanic and well driller. R. 16, 18, Finding 7. Nevertheless, the ALJ found that Jarvis retained the residual functional capacity ["RFC"] to perform the full range of the physical exertional requirements of "light to sedentary work." R. 18, Finding 6. The ALJ found that Jarvis could sit for forty-five to sixty minutes (and then would need to stand), and could walk for ten to fifteen minutes. *Id.* The ALJ also found that Jarvis had no upper extremity problems. *Id.* Based on the testimony of the VE, the ALJ found that Jarvis had skills transferable to skilled work from his previous jobs. R. 19, Finding 10. The ALJ, therefore, concluded that Jarvis had the RFC to perform a significant range of light work. R. 19, Finding 11. Applying the Medical-Vocational Guidelines as a framework for decision-making after hearing the VE's testimony, the ALJ concluded that Jarvis could work as an electronics assembler, surveillance systems monitor, maintenance service dispatcher, and a produce checker. R. 19, Finding 12. The ALJ therefore found that Jarvis was not disabled.[1] R. 19, Finding 13.

After considering additional medical records, R. 210-51, the Appeals Council denied review. R. 4-7. On April 4, 2005, Jarvis timely appealed the Appeals Council's decision to the United States District Court. Docket No. 1 at 1. On January 31, 2006, Jarvis filed in this Court a memorandum of law in support of his appeal. Docket No. 20. On April 3, 2006, the Commissioner filed a

---

[1]The Social Security ALJs face a herculean task. The Commissioner now expects ALJs to hear and decide 50 to 55 decisions per month according to a former Chief ALJ in a July 2005 presentation at a Federal Judicial Center workshop on disability appeals. With only the help of non-attorney decision-writers and staff attorneys, the ALJs must rapidly process a monumental backlog of thousands of complex, aging cases. The effects are felt in the district court. According to the AOUSC, the Middle District of Florida has the third highest volume of disability appeals in the nation. Each magistrate judge in the Orlando Division, for example, resolves approximately fifty-three appeals every year — an average of about one per week.

memorandum in support of her decision that Jarvis was not disabled.  Docket No. 21.  The appeal is ripe for determination.

## II.    **THE PARTIES' POSITIONS**

Jarvis assigns four errors to the Commissioner.  First, Jarvis claims that the Commissioner erred in finding that Jarvis retained the RFC to perform light work because a treating physician opined that Jarvis could not perform any work.  Docket No. 20 at 8-15.  Second, Jarvis claims that the Commissioner erred by failing meet her burden to establish that Jarvis could perform other work that exists in the national economy.  More specifically, Jarvis argues that the ALJ failed to accurately describe Jarvis' limitations in his hypothetical questions to the VE.  *Id.* at 15-17.  Third, Jarvis claims that the Commissioner erred by improperly evaluating Jarvis' complaints of pain.  *Id.* at 17-18. Fourth, Jarvis argues that the Commissioner erred by improperly finding that Jarvis' testimony was "not totally credible."  *Id.* at 18-20.

According to the Commissioner, substantial evidence supports her decision to deny disability. First, the Commissioner argues that the ALJ correctly concluded that the treating physician's opinion was inconsistent with the physician's own previous recommendations and conservative treatment of Jarvis, and with other evidence in the record.  Docket No. 21-1 at 8-10.  Second, the Commissioner argues that she met her burden of establishing the Jarvis could perform other work through proper VE testimony.  *Id.* at 10-11. According to the Commissioner, the ALJ's hypothetical questions to the VE accurately described Jarvis' limitations.  *Id.*  Third, the Commissioner argues that she properly evaluated Jarvis' complaints of pain, and properly applied the relevant legal standards for evaluating

pain testimony. *Id.* at 11-14. Fourth, the Commissioner argues that the ALJ properly discredited Jarvis' testimony as not credible. *Id.*

III.    **THE STANDARD OF REVIEW**

   A.    **AFFIRMANCE**

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

-4-

### B.      REVERSAL

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause.   42 U.S.C. § 405(g)(Sentence Four).   The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.  *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).   This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984).  A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

### C.      REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of  42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.

*Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is

-6-

a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level. *See Jackson*, 99 F.3d at 1090 - 92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also*, *Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095. With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. *Jackson*, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[2] *Id.*

### D. STANDARD OF REVIEW WHERE APPEALS COUNCIL CONSIDERS NEW EVIDENCE

After the ALJ's decision — but before the Appeals Council decision — Jarvis submitted additional medical records covering the period from January 3, 2003 through March 4, 2004. R. 7, 210-51. If a claimant submits evidence that does not relate to the relevant period under consideration, "the Appeals Council will return the additional evidence to [the claimant] with an explanation as to why it did not accept the additional evidence and will advise [the claimant] of [his or her] right to file a new application." 20 C.F.R. § 404.976(b)(1)(2005). The Appeals Council did not return the

---

[2] The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.* Any Plaintiff intending to seek attorney's fees for past-due benefits under 42 U.S.C. § 406 (b)(1)(A) shall move the Court to include in any remand order an extension of the 14-day period described in Fed. R. Civ. P. 54 (d)(2)(B) so as to specify an extended deadline that follows the Commissioner's determination of Plaintiff's past-due benefits. *Bergen v. Commissioner*, __ F. 3d __, 2006 WL 1843633 n.11 (11th Cir. July 6, 2006).

additional evidence to the claimant.  Rather, the Appeals Council properly made the evidence a part of the record, and also considered the evidence in denying review.  R. 4, 7.  The district court also must consider the new evidence in determining whether the Commissioner erred in denying review of the ALJ's decision.

Congress left the term "final decision" undefined in 42 U.S.C. § 405(g).  Where a claimant exhausts his administrative remedies by requesting review by the Appeals Council and the Appeals Council then denies review,  the Appeals Council's order denying review is a "final decision" of the Commissioner under § 405(g).  *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2083 (2000); *accord*, *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983); *Williams v. Comm'r of Soc. Sec.*, 407 F. Supp. 2d 1297, 1302-03 (M.D. Fla. 2005) (Appeals Council's denial is a final decision of the Commissioner that is subject to judicial review under section 405(g).   The Appeals Council "will" review a case if there appears to be an abuse of discretion by the ALJ, if there is an error of law, or if the ALJ's action, findings, or conclusions are not supported by substantial evidence.  20 C.F.R. § 416.1470; *Sims*, 120 S.Ct. at 2086; *see also, Parker v. Bowen*, 788 F.2d 1512, 1518 (11th Cir. 1986) (en banc).  The Appeals Council's denial of review is subject to judicial review to determine if it is supported by substantial evidence. *Sims*, 120 S.Ct. at 2086.

Just as the ALJ has a duty to investigate the facts and to develop the arguments both for and against the granting of benefits, the Appeals Council's  review is similarly broad.  *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000).  The Appeals Council, not the claimant, has the primary responsibility for identifying and developing the issues. *Sims*, 120 S.Ct. at 2086.  When the Appeals Council refuses to consider new evidence submitted to it and denies review, the Appeals Council's

-8-

decision denying review is subject to judicial review.  20 C.F.R. §§ 404.970(b); 416.1470(b); *Sims*, 120 S.Ct. at 2086;  *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994).  Furthermore, the Appeals Council commits reversible error when it refuses to consider new evidence and then denies review.  *Keeton*, 21 F.3d at 1066.  Similarly, it is *reversible error* for a district court to consider only the evidence presented to the ALJ — and to ignore the new evidence presented to the Appeals Council — in reviewing a decision of the Appeals Council.  *Keeton*, 21 F.3d at 1066.

The Appeals Council must consider and evaluate new evidence to determine whether there is a basis for changing the ALJ's decision.  *Sims*, 120 S.Ct. at 2086;  *Falge v. Apfel*, 150 F.3d 1320, 1322 n. 4 (11th Cir. 1998).  When the Appeals Council has denied review, the district court looks only to the evidence actually presented to the ALJ in determining whether the *ALJ's decision* is supported by substantial evidence.  *Falge*, 150 F.3d at 1323; *accord, Eads v. Sec'y of Health and Human Services*, 983 F.2d 815, 817 (7th Cir. 1993) (ALJ cannot be faulted for failure to weigh evidence never presented to him).  Nevertheless, there is an important difference between *Falge* and this case — a difference stressed by the United States Court of Appeals for the Eleventh Circuit.  In *Falge*, the claimant did not appeal the Appeals Council's decision to deny review.  Instead he appealed only the *ALJ's decision* to deny benefits.  150 F.3d at 1324.

In this case, Jarvis could have been more precise in specifying whether he limited his appeal to the ALJ's decision to deny benefits, or instead sought review of the decision of the Commissioner through the Appeals Council in denying review.  By using broad language "the decision of the Defendant", Jarvis nevertheless does seem to appeal from and seek a reversal of the Appeals Council's

decision to deny review.  Docket No. 1 at 2, paragraph 1.  The Eleventh Circuit directs the district courts to consider evidence submitted to the Appeals Council in reviewing the Appeals Council's denial of review.  *Falge*, 150 F.3d at 1324; *Keeton*, 21 F.3d at 1066; *accord, Higgenbotham v. Barnhart*, 405 F.3d 332, 337-38 (5th Cir. 2005); *Williams*, 407 F. Supp. 2d at 1303.

Indeed, it makes sense that Congress has provided for judicial review of the Commissioner's final decision — the last step of review necessary to exhaust administrative remedies.  When the Appeals Council refuses to consider new evidence submitted to it, the Appeals Council's decision denying review is subject to judicial review for error.  *Sims*, 120 S.Ct. at 2086;  *Keeton*, 21 F.3d at 1066.  Similarly, when the Appeals Council denies review of an ALJ's decision after receiving, considering, and evaluating new and material evidence that clearly and thoroughly undermines the ALJ's findings of fact and conclusions of law, the Appeals Council's decision denying review also must be subject to judicial review for error.  *See Falge*, 150 F.3d at 1324;  *Keeton*, 21 F.3d at 1066, 1068; 20 C.F.R. § 404.970(b) (Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the relevant period, and it will then review the case if it finds that the ALJ's action, findings, or conclusion is contrary to the weight of the evidence currently of record).  The Commissioner cannot avoid judicial review of the Appeals Council's decision to deny review by considering but not acting on new evidence that is highly probative of disability, or by considering but not acting on evidence that shows in retrospect that an ALJ's action, findings, or conclusion are contrary to the weight of the evidence currently of record.

In this case, the claimant has appealed an unfavorable decision to the Appeals Council as a necessary step in exhausting administrative remedies.  The Appeals Council has considered claimant's

additional evidence in light of the issues raised in the request for review, has considered the applicable statutes and regulations, has considered the ALJ's decision, and has issued a written final decision determining that the ALJ neither erred nor abused his discretion, and determining that the ALJ's findings are supported by substantial evidence.  The Appeals Council's determination is subject to judicial review.  The Commissioner cannot avoid judicial review of the Appeals Council's final decision by passing a regulation defining the term "final decision of the Commissioner of Social Security" in 42 U.S.C. § 405(g) as the decision of the ALJ, and by calling the Appeals Council's final decision a "denial of review." *See Sims*, 120 S.Ct. at 2086; *accord, Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (Appeals Council's denial of review was a judicially reviewable final decision under 42 U.S.C. § 405(g)); *Williams*, 407 F. Supp. 2d at 1302-03.

## IV.   THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

### A.   DEVELOPING THE RECORD

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security

-11-

hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Cowart*, 662 F.2d at 735 (citations omitted).

## B.    THE FIVE STEP EVALUATION

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments (considering his or her residual functional capacity, age, education, and past work)

prevent him or her from doing other work that exists in the national economy, then claimant is disabled.  20 C.F.R. § 404.1520(f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *See Jamison v. Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985 F.2d at 534.  A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly.  *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work.  *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).  In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"].  This assessment measures whether a claimant can perform past relevant work despite his or her impairment.  20 C.F.C. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).  The ALJ makes this

-13-

determination by considering the claimant's ability to lift weight, sit, stand, push, and pull.  *See* 20 C.F.C. § 404.1545(b).

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant.  *See* SSR 82-61.  If so, the claimant is not disabled.  If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy.  SSR  82-61.  In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy.  20 C.F.C. § 404.1567.

The claimant must prove disability on or before the last day of his or  her insured status for the purposes of disability benefits.  *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416(i)(3); 423(a), (c).  If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite the claimant's disability.  *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

### C.    OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.  *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201

(11th Cir. 1989).  This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"].  *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements). Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills."  *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert.  *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy.  *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a

wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### D.    TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician. *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Sabo v. Commissioner of Social Security*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements). Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

-16-

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner. 20 C.F.R. § 404.1527(e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error.  *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).  Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence.  *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

### E.   PAIN

Pain is a non-exertional impairment.  *Foote*, 67 F.3d at 1559; 826 F.2d at 1003.  Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.   42 U.S.C. § 423(d)(5)(A).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1529.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

### F.   CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not

disturb a clearly articulated credibility finding with substantial supporting evidence in the record. *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986). As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

## G.    MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also, Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may

be reversible error).  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

V.      **APPLICATION AND ANALYSIS**

   A.      **THE FACTS**

Jarvis was born on May 5, 1959, and was forty-five years old on the date of the ALJ's hearing. R 157. Jarvis completed the twelfth grade, and has past relevant work experience as a truck mechanic and a well driller.  R. 61-62, 260.  Jarvis claims disability as of March 2, 2002 due to a spinal cord infarction with partial paraplegia.  R. 55.  Jarvis also has a history of diabetes and low back pain that began before March 2, 2002, the date of his infarction.  *See* R. 121.  Jarvis worked as a truck mechanic until his alleged onset date.

On March 2, 2002, Jarvis was walking around his house when he experienced a sudden onset of back pain.  R. 120.  Jarvis laid down, massaged his back, and had his wife rub his legs, and the pain resolved.  *Id.*  Jarvis, however, subsequently developed sudden lower extremity weakness, became unable to walk, and went to the Florida Hospital Medical Center emergency room.  R. 87, 120.  Jarvis underwent a series of medical tests and examinations, including a neurological evaluation, an MRI of the brain and cervical spine, and a lumbar puncture test.  R. 87, 89-107.  A myelogram dated March 4, 2002 revealed disc degeneration at L2-3 (R. 93), and an EMG/Nerve Conduction Test performed on March 6, 2002 revealed evidence of severe axonal neuropathy mostly in Jarvis' lower extremities. R. 89-90.  None of the test findings, however, explained the cause of Jarvis' sudden onset of paraplegia.  R. 87.  On March 8, 2002, the doctors at Florida Hospital transferred Jarvis to the Neurology Department at Shands Healthcare Hospital for further evaluation.  R. 90.

On March 8, 2002, Jarvis entered Shands Healthcare Hospital with paraplegia, and inability to feel pain or temperature up to the T12 or L1 region. R. 108. At the hospital, Jarvis underwent more medical tests, including a bubble echocardiogram, a CT scan of the abdomen, an MRA of the thoracic and lumbar spine, and an MRI of the thoracic and lumbar spine. *Id.* The hospital doctors diagnosed paraplegia secondary to an anterior spinal artery infarction at the T12 level. *Id.* The doctors recommended that Jarvis undergo rehabilitation therapy, and discharged him on March 15, 2002. R. 108. His discharge summary also states that "[b]ecause [Jarvis] is a wage earner in the family, he will likely need to receive disability because he is going to have long-term deficits related to this problem." R. 108-09.

On March 16, 2002, Jarvis entered the Florida Hospital Orlando rehabilitation center, and underwent in-patient rehabilitation therapy until March 29, 2002. R. 121. On admission, Jarvis' diagnosis was incomplete T12 paraplegia (caused by a spinal cord infarction); limitation in gait mobility, and self-care skills; neurogenic bowel and bladder; diabetes mellitus; and chronic low back pain. *Id.* During the course of his rehabilitation treatment, Jarvis developed a groin rash with was treated with a topical antifungal cream. R. 122. Jarvis also had neurogenic bowel and bladder, and treatment for those problems were initiated during rehabilitation as well. *Id.* Jarvis otherwise improved throughout the rehabilitation course, and was discharged in March 29, 2002 with home health care equipment. *Id.* Jarvis' discharge instructions were to follow up with various doctors and to perform outpatient physical therapy with the appropriate medical equipment. *Id.*

On April 18, 2002, Jarvis visited Dr. Michael Creamer of the rehabilitation center for a follow-up visit. R. 152. Jarvis reported that he was improving, and stated that he had lost control of his

bladder and bowels only once since he left the hospital.  *Id.*.  Dr. Creamer noted that Jarvis was able to feel some patchy sensation below the T12 dermatomal region, but that Jarvis continued to have diminished muscle strength in his bilateral lower extremities.  *Id.*.  Dr. Creamer diagnosed T12 incomplete paraplegia and neurogenic bowel and bladder, but observed that both Jarvis' leg strength and his bowel and bladder problems seemed to be improving.  *Id.*  He recommended that Jarvis continue physical therapy to further improve mobility and strength, continue taking his medications, and return for a follow-up appointment in one month.  *Id.*

On May 6, 2002, Jarvis went to a follow-up appointment at the Shands Healthcare.  R. 126. Dr. Melvin Greer's notes dated May 14 and 19, 2002,  indicate that Jarvis was able to walk with an orthotic apparatus as well as a cane.  *Id.*  Jarvis reported doing "very well" in strength training and gait improvement over the previous six weeks.  R. 128.  Jarvis reported having problems with bowel and bladder control while he was at the hospital, but stated that he now had no problems with bladder control other than urgency.  *Id.*  Jarvis also complained of constipation.  *Id.*  Jarvis' physical examination revealed mainly normal results, other than weakness and decreased sensation in Jarvis' lower extremities.  R. 126-27.  Dr. Greer observed that "[b]ecause [Jarvis] does have a primary Neurologist in Orlando and he continues to improve so dramatically, we probably do not need to follow-up with him . . ."  R. 127.  The doctor also called Jarvis' improvement "very gratifying."  R. 126.

On May 20, 2002 Jarvis returned to Dr. Creamer at the rehabilitation center for his follow-up appointment.  R. 151-52.  Jarvis reported continuing the physical therapy and feeling that he made improvements in his strength.  R. 152.  Jarvis complained of some groin and lower back pain, which

Dr. Creamer noted were likely related to Jarvis' ambulatory activities and physical therapy. *Id.* Dr. Creamer's physical examination revealed improvements with dorsiflextion of the feet. R. 151. The doctor recommended continuing physical therapy, and dispensed a trial of Vioxx medication to alleviate Jarvis' joint inflammation. *Id.*

On May 21, 2002, Jarvis visited Dr. Robert Cambridge, a neurologist who first evaluated Jarvis while he was in the Florida Hospital Medical Center. R. 129. Dr. Cambridge's physical examination revealed weakness, diminished pain and temperature in Jarvis' lower extremities. R. 129. Jarvis' other modalities were intact. *Id.* Dr. Cambridge observed that Jarvis walked with a cane with a slight limp on the right side. *Id.* Dr. Cambridge noted that Jarvis had made a "remarkable recovery." *Id.*. He recommended that Jarvis continue with his physical and medication therapy, and advised him to return to the clinic in six months for a follow-up appointment and another EMG/nerve conduction study. R. 130.

Jarvis called Dr. Creamer on May 28, 2002 to report that the Vioxx medication caused ankle swelling. R. 151. The doctor refilled Jarvis' other medications, prescribed Bextra medication, and advised Jarvis to stop using Vioxx. *Id.*

Jarvis filed his claim for disability insurance benefits on June 6, 2002. R. 50. On June 13, 2002, Dr. Creamer saw Jarvis, who reported that he was "making some progress" but continued to have left hip pain. R. 151. Jarvis stated that Bextra medication was helpful for two days, but then failed to alleviate his pain. R. 150. Dr. Creamer recommended increasing the Bextra dosage. *Id.* He also recommended an x-ray to consider injection therapy, as well as continuation of Jarvis' current therapy regime. *Id.* On July 1, 2002, Jarvis returned to Dr. Creamer, and with complaints that Bextra

made his leg swell.  Jarvis stated that instead, he took Celebrex, a non-steroidal anti-inflammatory medication, but reported no substantial pain relief.  R. 150.  Dr. Creamer diagnosed left hip pain of uncertain etiology, and noted that it was possibly related to arthritic changes.  R. 149.  Dr. Creamer recommended increasing the dosage of Celebrex.  *Id.*

On July 24, 2002, Jarvis saw Dr. Marla Richardson, also from the rehabilitation center.  R. 149.  Dr. Richardson had not yet seen results from Jarvis' left hip x-ray.  R. 148.  Jarvis stated that he had received oral results which revealed only arthritic changes.  *Id.*

On August 13, 2002, Jarvis returned to Dr. Richardson for another visit.  Jarvis told the doctor that two doses of Celebrex each day helped his pain, but stated that he suffered headaches as a side effect.  R. 148.  One dose of Celebrex did not help Jarvis.  *Id.*  Dr. Richardson conducted a physical examination.  Jarvis walked with a cane, and did not have any swelling or edema.  R. 147.  He had mild tenderness to palpation over his left hip, and full range of motion with flexion and extension of the left hip.  *Id.*  Dr. Richardson recommended that Jarvis continue taking his current medications, and discussed the possibility of steroid injections to the hip for pain relief.  *Id.*

On August 21, 2006, Jarvis returned to the rehabilitation center and saw Dr. Creamer.  R. 146-47.  Jarvis reported attending the Wellness Center therapy three times a week.  R. 147.  He also reported being able to mow his yard (although more slowly than before his infarction), and told the doctor that he was working out three times a week and "tolerating this well."  R. 146-47.  Jarvis also stated that he anticipated returning to work sometime during the next year, and requested clearance to drive.  R. 147.  Dr. Creamer recommended continuing the exercise and wellness programs.  He

completed Jarvis' disability forms, and advised Jarvis to contact Adaptive Mobility to evaluate his driving skills. R. 146.

On September 18, 2002, Dr. Creamer saw Jarvis again. R. 146. Jarvis complained that Adaptive Mobility's evaluation cost $200, and stated that he did not understand the necessity of taking a driving test. *Id.* Jarvis also reported improvement physically, but expressed concern that he could not squat. He explained that he had pain in his left hip which exacerbated by squatting. *Id.* Dr. Creamer noted that Jarvis walked without using an assistive device, and recommended increasing the dosage of Celebrex to alleviate the hip pain. R. 145. Dr. Creamer also advised Jarvis to consider "light duty if he is not able to perform the job duties that he was once able to perform." *Id.* The doctor also recommended that Jarvis "consider alternative jobs [other than truck mechanic] in his company." *Id.*

On October 1, 2002, a non-examining state agency physician completed a physical RFC assessment. R. 133-40. The physician opined that Jarvis could lift and carry twenty pounds occasionally and ten pounds frequently; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; and push and pull without limitation. R. 134. The physician further opined that Jarvis did not have any postural, manipulative, communicative, or environmental limitations. R. 135-38.

On October 16, 2002, Jarvis told Dr. Creamer that he completed the Adaptive Mobility driving test, and was cleared to drive. R. 145. Jarvis complained that the increased dosage of Celebrex did not alleviate his hip discomfort. *Id.* Dr. Creamer advised Jarvis to seek work that was "light-duty," but Jarvis related that his employer had no light-duty work. *Id.*. Dr. Creamer's notes do not specify

what he meant by "light duty."  *See* R. 144-45.  Dr. Creamer recommended a trial of Neurontin medication for Jarvis' pain, and told Jarvis to follow-up with Dr. Richardson.  R. 144.

On November 12, 2002, Jarvis complained to Dr. Richardson of some low back and left hip pain, bilateral lower extremity numbness, a tingling and burning sensation in both feet, which worsened with prolonged standing.  R. 144.  Jarvis also stated that he did not take Neurontin as recommended because he read on the internet that Neurontin was typically a seizure medication and could cause cancer as a side effect.  *Id.*  Jarvis reported taking Celebrex, which gave him some relief from his hip pain, but did not relieve his low back pain or the numbness, tingling, and burning sensations in his lower extremities.  *Id.*  Dr. Richardson's physical examination of the lower extremities revealed no swelling or clubbing, and intact sensation for light touch.  R. 143.  The doctor diagnosed bilateral lower extremity paresthesias, recommended that Jarvis continue his exercise and medication therapy, and discussed the side effects of Neurontin.  *Id.*

On December 5, 2002, Dr. Creamer saw Jarvis, who stated that he continued to have low back and left lower extremity pain  R. 142.  Anti-inflammatory medications were unhelpful.  *Id.*  A physical examination revealed that Jarvis had 5/5 muscle strength throughout his lower extremities, but that Jarvis tired easily with ambulatory activities.  *Id.*  Dr. Creamer recommended that Jarvis continue taking all medications.  He also advised Jarvis to consider other treatment options, including a spinal cord stimulator, as his symptoms were "most likely related to neuropathic pain from the spinal cord injury."  *Id.*.  Dr. Creamer diagnosed T12 incomplete paraplegia, and bilateral lower extremity paresthesias.  *Id.*.  Additionally, Dr. Creamer noted that he completed forms for Jarvis "documenting his inability to return to work at this time."  *Id.*

-26-

On January 10, 2003, another non-examining state agency physician assessed Jarvis' physical RFC. R. 182-89. The physician opined that Jarvis retained the ability to lift and carry twenty pounds occasionally and ten pounds frequently; stand and/or walk six hours in an eight-hour workday; sit for six hours in an eight-hour workday; and push and/or pull without limitation. R. 183. The physician stated that Jarvis could climb ramps and stairs occasionally, but never climb ladders, ropes and scaffolding. R. 184. Jarvis could stoop, kneel, crouch, and crawl occasionally, and balance frequently. *Id.* Jarvis had some environmental limitations. R. 186. According to the physician, Jarvis had to avoid concentrated exposure to extreme cold, wetness, humidity, and hazards such as machinery and heights. *Id.* Further, Jarvis had no manipulative, visual, or communicative limitations. R. 185-86.

On October 15, 2003, Jarvis saw Dr. Creamer, who reported that treatment for his bladder problems improved his overall flow of urine. R. 201. Jarvis stated that his left leg "gives out on him" occasionally, and complained of low back pain. *Id.* The physical examination showed "a slight decrease from previous" tests of his lower extremities. *Id.* Dr. Creamer recommended an MRI of the lumbar spine, and refilled Jarvis' Celebrex prescription. *Id.*

On November 3, 2003, Jarvis underwent an MRI of his lumbosacral spine. R. 203. The MRI revealed disc bulging at L2-L3, L3-L4, and L4-L5 with mild to moderate spinal stenosis. *Id.* Dr. Creamer reviewed the MRI results with Jarvis on November 26, 2003. R. 199. Dr. Creamer concluded that the mild to moderate stenosis indicated by the MRI were likely contributing to Jarvis' lower extremity pain and persistent weakness. *Id.* Jarvis agreed to receive epidural steroidal

-27-

injections to relieve his pain and improve functional activities. *Id.* Jarvis received lumbar epidural steroid injections on December 8, 15, and 22, 2003. R. 195-98.

On May 22, 2004, Dr. Creamer completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) on behalf of Jarvis. R. 190-92. Dr. Creamer opined that, as a result of his paraplegia, Jarvis could lift less than ten pounds occasionally and frequently; could not ambulate effectively on a sustained basis; and could sit less than six hours in an eight-hour day. R. 190. Dr. Creamer further stated that Jarvis' ability to push and pull were affected by the impairment", and that Jarvis had limitations in both upper and lower extremities. R. 191. Further Jarvis could never climb, balance, kneel, crouch, crawl or stoop, and could occasionally reach, handle, finger, and feel. R. 191-92. Dr. Creamer also stated that Jarvis should have limited exposure to hazards such as machinery and heights, but stated no other visual, communicative, or environmental limitations. R. 192. Finally, Dr. Creamer concluded that Jarvis could not sustain work activity for an eight-hour work day (with normal breaks) and a forty hour work-week, and stated that he considered Jarvis' complaints of pain and other impairments to be credible. *Id.*

### 1.   The ALJ Hearing

On June 16, 2004, Jarvis testified at a hearing before the ALJ. R. 252-73. Jarvis described his typical day. R. 262-66. He dresses himself, but his wife has to help him put on his socks. R. 262. He is able to shower himself, and then he takes medications for his diabetes, bladder problems, for his pain (anti-inflammatory medication), and a blood-thinner (to prevent further strokes). R. 263-64. He typically stays at home by himself during the day. R. 264. He is able to drive, and the furthest distance he had driven since his stroke was from his house to the ALJ hearing. R. 264-65, 271. He

-28-

went on his boat twice since his infarction, but he brought people to help him each time. R. 265. His friends stop by his house, and he visits them occasionally. R. 266. He has an above-ground pool, and he "get[s] in the pool [to] do some exercise." R. 266-67. He has trouble sleeping, but he is able to stay in bed through the night. R. 267-68.

Jarvis also testified about his impairments. R. 268-72. He has bladder and bowel control problems. R. 268-69, 274. Jarvis forces himself to use the restroom every two or three hours to try to avoid having accidents. R. 268-69. He uses a cane to walk, and can only walk fifty to seventy-five feet before his legs tire. R. 269. Jarvis also testified that he can only sit for approximately twenty to thirty minutes before he has to stand. R. 270. He could probably then stand for twenty to thirty minutes. *Id.* He stated that after switching from sitting to standing, he could probably sit for another twenty to thirty minutes. *Id.* Jarvis further testified that he felt constant pain in his legs, as well as a tingling and burning sensation, and that his pain was worse in his left hip. R. 271. He also stated that the three epidural steroid injections did not alleviate his pain. R. 272. The ALJ also heard testimony from a VE. R. 274-86.

## 2. New Evidence Submitted to the Appeals Council

Dr. Creamer's medical source statement dated May 22, 2004, is the last record before the ALJ hearing on June 16, 2004. *See id.*; R. 252. After the ALJ's decision, Jarvis submitted additional medical records covering from the period from January 3, 2003 through March 4, 2004. R. 210-51. The Appeals Council considered these documents, and made them part of the record. R. 4, 7. The records consist of office visit notes and laboratory test results associated with Dr. Creamer's treatment of Jarvis from January 3, 2003 through March 4, 2004. R. 210-51. The records summarize Jarvis'

visits with Dr. Creamer after Dr. Creamer advised Jarvis to consider treatment options other than physical therapy and medications (the spinal cord stimulator) (*see* R. 142), up to the date Dr. Creamer completed the medical source statement on Jarvis' RFC (*see* R. 190-92).

On January 3, 2003, Jarvis told Dr. Creamer that he was considering the spinal cord stimulator for treatment of his low back and lower extremity pain. R. 251. Jarvis also expressed interest in undergoing urodynamic studies to help his neurogenic bowel and bladder, which Dr. Creamer noted was "improving." *Id.* On January 3, 2003, Jarvis also sought treatment with Dr. Richardson for a rash on his legs, which later cleared after treatment with cream. R. 235, 249-50. On January 8, 2003, Dr. Creamer completed a Urodynamic Clinical Report dated (based on urodynamic test results, R. 242-48), and diagnosed hypotonic neurogenic bladder. R. 241. On January 30, 2003, Dr. Creamer discussed with Jarvis the results of his urodynamic studies. R. 235. Dr. Creamer suggested that Jarvis see a urologist for the prostatic hypertrophy which contributes to Jarvis' large volume of urine in the bladder, as well as his slow output of urine. *Id.*

On February 27, 2003, Jarvis returned to Dr. Creamer, and reported that his pain was relatively stable. R. 233. Jarvis expressed eagerness to work, and stated that he believed that he would be physically able to complete his former job activities, which include some significant bending, lifting, and walking. *Id.* Jarvis asked that Dr. Creamer fill out forms allowing him to return to work. Jarvis expressed concern that he would have physical limitations to working, but stated that he was willing to address them as they arose. *Id.* Dr. Creamer's physical examination revealed 5/5 muscle strength throughout Jarvis' lower extremities with a slight decrease in ankle flexion on the left side. *Id.* Jarvis' sensation was grossly intact to light touch. *Id.* Dr. Creamer recommended that Jarvis continue his

current medications, and also completed forms allowing Jarvis to return to work. *Id.* During this visit, Jarvis also reported seeing a urologist, who told Jarvis that his symptoms were stable at this time. *Id.* Jarvis stated that he planned to follow-up with the urologist. *Id.*

On April 9, 2003, Jarvis reported returning to work, but his job had been terminated. R. 232. Jarvis complained of lower back and leg pain, as well as parasthesia in the lower extremities and difficulty with prolonged walking and sitting. *Id.* Jarvis told Dr. Creamer that he had applied for other jobs, but that "because of his physical limitations, he is not felt to be employable." *Id.* A physical examination revealed 4/5 strength in Jarvis' upper and lower extremities, with left ankle dorsiflexion at 3+/5. *Id.* Dr. Creamer noted Jarvis' ability to ambulate without need for an assistive device, although Jarvis was unable to walk on his heels or toes. *Id.* Dr. Creamer recommended that Jarvis continue his current medications, and follow-up within two months. *Id.* In his notes, Dr. Creamer also states:

> It would appear that [Jarvis] has significant limitations on his ability to perform various physical activities. Therefore he would appear to have the ability to perform sedentary activities, [sic] anything beyond this would potentially put him at risk for falls and further injury. Therefore, it appears that he is significantly disabled from any type of employment within his capabilities based on his education and physical strength.

R. 232.

On May 21, 2003, Jarvis visited Dr. Richardson, and told her that he had recently undergone a twenty- four hour urine collection as ordered by his urologist. R. 229. He did not know the results. *Id.* Dr. Richardson noted that Jarvis walked without an assistive device, but had a slight limp. *Id.* Her impression was T12 incomplete paraplegia (secondary to a spinal infarction); neurogenic bowel and bladder, "improving, under the care of . . . [the] urologist"; Type II diabetes, under the care of

-31-

Jarvis' endocrinologist; left hip pain, etiology unclear, possibly related to arthritic changes; and bilateral lower extremity paresthesias. *Id.* Dr. Richardson recommended that Jarvis continue taking his medications, follow-up with all of his treating physicians, and follow-up with her on an annual basis (or as needed). R. 229-30.

On July 10, 2003, Jarvis saw Dr. Creamer, and reported that his bowel and bladder were stable. R. 228. Jarvis reported being able maintain continence. *Id.* Dr. Creamer noted Jarvis' past problems with neurogenic bladder, and suggested that Jarvis undergo more urodynamic testing to determine the necessity of further treatment. *Id.* Dr. Creamer's physical examination revealed unchanged results. Jarvis continued to have weakness with left ankle dorsiflexion at 3+/5. *Id.*

Jarvis underwent more urodynamic testing on August 28, 2003. R. 218-25. Dr. Richardson completed a urodynamic report. R. 225-27. Her impression was neurogenic bladder with evidence of hypotonicity with poor contraction of the detrusor muscle, and detrusor sphincter dysnergia. R. 226. She recommended trying Urecholine medication, which would help Jarvis fully empty his bladder over the appropriate period of time. *Id.* Dr. Creamer also recommended Urecholine. R. 217.

On January 21, 2004, Jarvis saw Dr. Creamer after undergoing the three epidural steroid injections. R. 213. Jarvis reported a slight reduction in low back and lower extremity pain, but stated that his overall medical status remained unchanged. *Id.* Dr. Creamer refilled Jarvis' Celebrex prescription. *Id.* On March 4, 2004, Jarvis went back to Dr. Creamer. Dr. Creamer wrote: "His status is stable. Medications are well tolerated. No issues or concerns are reported." R. 210. Dr. Creamer recommended that Jarvis continue taking his medications, and that he follow-up in three months. *Id.*

-32-

**B.    THE ANALYSIS**

1.    The Treating Physician's Opinion

Jarvis first argues that the ALJ improperly rejected the opinions of Dr. Creamer, his treating physician.  On May 27, 2004, Michael Creamer, D.O., completed a Medical Source Statement describing the physical work-related activities that Jarvis could do between March 2002 and May 27, 2004.  R. 190.  According to Dr. Creamer, Jarvis could lift less than ten pounds occasionally and frequently, could not ambulate effectively on a sustained basis, and could sit less than six hours in an eight-hour day during that period as a result of paraplegia.  *Id.*  Dr. Creamer further found that Jarvis was limited in his ability to push and pull in both his upper and lower extremities, and that Jarvis could never climb, balance, kneel, crouch, crawl, or stoop.  R. 191.  In addition, Dr. Creamer opined that Jarvis could occasionally reach, handle, finger, or feel, and that Jarvis had to limit his exposure to hazards such as machinery and heights.  R. 191-92.  Dr. Creamer also concluded that Jarvis could not sustain work activity for an eight-hour workday with normal breaks during that period, and that he considered Jarvis' allegations of pain to be credible.  R. 192.

The record contains RFC assessments by three physicians – Dr. Creamer and two non-examining state agency physicians.  The ALJ rejected all three.  R. 16.  In his decision, the ALJ first noted that two state agency physicians opined that Jarvis could perform light work.  The ALJ next stated that he accorded "this opinion [sic] little weight as it [sic] does not take into consideration [Jarvis'] difficulty with ambulation and his back pain."  *Id.*  In addition, the ALJ observed that:

> On October 16, 2002, Dr. Creamer recommended that the claimant perform light duty work but the claimant related that there was no light-duty work available at his site of employment.  On November 12, 2002, Dr. Creamer opined that the claimant should consider light duty if he was not able to perform the job duties that he once was able

-33-

to perform and he recommended that the claimant consider alternate jobs in his company.

R. 16.  The ALJ then summarized Dr. Creamer's May 27, 2004 Medical Source Statement, and accorded Dr. Creamer's opinions "little weight" because:

> [Dr. Creamer] initially recommended light duty and even recommended an alternative job in the event that he could not perform his previous job.  Further, his own treatment records do not substantiate the severe restrictions in his medical assessment.  Accordingly, the [ALJ] finds the claimant retains the residual functional capacity to perform light to sedentary work.  He can sit for 45-60 minutes, then needs to stand.  He can walk for 10-15 minutes.  He has no upper extremity problems.

*Id.*

Jarvis contends that the ALJ erred by finding that Jarvis retained the RFC to perform light work despite Dr. Creamer's opinion that Jarvis could not work at all.  Docket No. 20 at 8-15.  Jarvis argues that the ALJ was wrong in disregarding the opinion of Dr. Creamer, a treating physician, because Dr. Creamer's opinions *are* consistent with his own recommendations and notes, as well as the record as a whole.  *Id.* at 11-12.  The Commissioner responds that the ALJ correctly concluded that the opinions were inconsistent with Dr. Creamer's earlier recommendations and his own treatment records.  Docket No. 21-1 at 8.  Therefore, argues the Commissioner, the ALJ stated "good cause" for rejecting the treating physician's opinion.  *Id.*

In rejecting Dr. Creamer's opinions, the ALJ did not explicitly state that Dr. Creamer's medical source statement was wholly conclusory, or that it was unsupported by the objective medical evidence. Rather, the ALJ compared Dr. Creamer's May 27, 2004 opinions with opinions and recommendations

of Dr. Creamer from two specific earlier dates.[3]  Twenty months earlier, on September 18, 2002, Dr.

Creamer had suggested that Jarvis consider light duty if he were unable to perform the job duties that

he once was able to perform, and recommended that Jarvis consider alternative jobs in his company.

R. 145.  On October 16, 2002, Jarvis reported that no light work was available at his site of

employment.  *Id.*  Dr. Creamer's notes did not explain what he meant by "light-duty," and there is no

evidence to infer that Dr. Creamer meant "Light Duty" as defined by the Social Security regulations.

*See* R. 145-46.

Dr. Creamer saw Jarvis numerous times between October 16, 2002 and May 27, 2004, as well

as prior to October 16, 2002.  R. 142-45, 213-51.  Some notes from these visits are consistent with Dr.

Creamer's overall assessment on May 27, 2004, and some are inconsistent.  At various times, both

Jarvis and Dr. Creamer hoped that Jarvis could return to work.  During several visits, Jarvis reported

improvement and the ability to perform some activities.  For instance, on August 21, 2002, Jarvis

requested clearance for driving, and told Dr. Creamer that he anticipated returning to work "sometime

during the next year."  R. 147.  On February 27, 2003, Jarvis reported taking a smaller dosage of

Celebrex, and stated that he felt able to return to work doing "significant bending, lifting, and

walking."  R. 233.  Further, Dr. Creamer noted: "[Jarvis] believes that he is physically able to

complete these activities and is willing to try . . . . He is concerned about the possibility that he may

have some physical limitations, but he is willing to followup with us to address them as they come

up."  *Id.*  During that visit, Jarvis asked Dr. Creamer to fill out forms allowing Jarvis to return to work,

---

[3]The ALJ states that Dr. Creamer recommended light work on October 16, 2002 and November 12, 2002.  R. 16.  The
November 12, 2002 date is incorrect.  Dr. Creamer discussed light duty work on September 18, 2002 and October 16, 2002.
R. 145-46.  Jarvis saw did not see Dr. Creamer on November 12, 2002.  *See* R. 142-44.

and Dr. Creamer obliged. *Id.* Thus, Dr. Creamer's willingness to release Jarvis to fairly strenuous work appears inconsistent with his May 27, 2004 opinions.

During other visits, however, Dr. Creamer expressed reservations about Jarvis' ability to work — statements which are *not* inconsistent with his May 27, 2004 opinions. On December 5, 2002, Dr. Creamer advised Jarvis to consider other treatment options, including a spinal cord stimulator, because his symptoms were "most likely related to neuropathic pain from the spinal cord injury." R. 142. At the same time, Dr. Creamer also noted that he had completed forms for Jarvis "documenting his inability to return to work at this time." *Id.* On April 9, 2003, Jarvis told Dr. Creamer that he tried to return to work, but that his job was terminated. R. 232. Jarvis also reported continued problems with lower back and leg pain and paresthesias in his lower extremities, as well as difficulty with prolonged ambulation and sitting. R. 232. In his April 9, 2003 visit notes, Dr. Creamer also opined that Jarvis had significant limitations in his ability to perform certain physical activities; that Jarvis cannot perform more than sedentary activities because of risk of falling; and that Jarvis is significantly disabled from any employment. *Id.* (record submitted to AC). On November 26, 2003, Dr. Creamer concluded that the stenosis revealed in Jarvis' MRI was likely contributing to Jarvis' lower extremity pain and persistent weakness, and recommended epidural steroid injections for the pain. R. 199.

In general, Dr. Creamer appears to have allowed Jarvis to return to work when Jarvis felt able and reported or exhibited improvement, but provided restrictions from working when Jarvis' relapsed or stated continued complaints of pain or weakness. For this reason, Dr. Creamer's notes, recommendations, and opinions are not always fully consistent. Without further explanation,

however, the variation in Jarvis' condition and in Dr. Creamer's opinions over time falls short of sufficient "good cause" for rejecting the treating physician's opinion.

Dr. Creamer saw Jarvis over fifteen times, and performed numerous physical examinations during his two-year treatment of Jarvis.  He was the only treating physician and the only examining physician to opine as to Jarvis' abilities to work.  In addition, Dr. Creamer's May 27, 2004 opinions are the most current medical opinions.  The ALJ noted only one inconsistency —  between Dr. Creamer's 2002 statements that Jarvis could return to "light duty" work and his 2004 medical source statement — as his basis for rejecting all diagnoses, opinions, and recommendations of Dr. Creamer. although the ALJ recited that Dr. Creamer's "own treatment records do not substantiate the severe restrictions in his medical assessment[,]" he failed to specify records other than the September and October 2002 notes already mentioned.  In light of Dr. Creamer's extensive relationship with Jarvis and prior notes and recommendations that are *consistent* with his May 27, 2004 opinions, the ALJ's specified reason for rejecting the treating physician's opinions is insufficient. Accordingly, the ALJ did not articulate good cause for rejecting the treating physician's opinion, and remand is necessary on this issue.

2.     The VE's Testimony

Jarvis also claims that the ALJ's hypothetical question to the VE did not adequately reflect Jarvis' limitations.  Jarvis argues that the ALJ should have included more impairments, namely as described in Dr. Creamer's opinion.  The Commissioner argues that she met her burden of establishing that Jarvis could perform other work with proper VE testimony.  Docket No. 21-1 at 10-11.

According to the Commissioner, the ALJ's hypothetical questions to the VE accurately described Jarvis' limitations. *Id.*

In this case, the ALJ correctly recognized that Jarvis' non-exertional impairments precluded exclusive use of the grids to establish that Jarvis could perform other work that exists in the national economy. *See* R. 17. The ALJ thus relied on VE testimony to help him determine whether a significant number of jobs exist in the national economy that Jarvis can perform given his RFC and other vocational factors. Reliance on VE testimony is proper where the hypothetical questions posed by the ALJ accurately depict a claimant's impairments.

During Jarvis' hearing, the ALJ asked the VE a series of hypothetical questions that attempted to assume work restrictions similar to Jarvis' impairments. The ALJ asked the VE to assume an individual of Jarvis' age and educational background who was able to perform both light and sedentary work. R. 276. The ALJ further asked the VE to:

> [a]ssume also that the person had some sit/stand adjustments that would have to be made in any job that he had. And assume that I found that the person could sit a maximum of 45 minutes to an hour at one time. And at that time then that person would have to stand and stretch for a bit and then be allowed to . . . sit down. Within this 45 minutes to an hour doesn't necessarily mean that the job would require him to sit an hour, but that it would require him to sit no more than an hour at a time. In other words . . . the job might require him to sit for 45 minutes or 35 or 25. But at the end of an hour that job would have to permit the person to get up and stretch and then sit again. Assume that . . . the person could stand 45 minutes to an hour without having to sit. Assume also that with walking the person would be limited to 10 to 15 minutes walking before they would have to sit and rest because the claimant has indicated he has some weakness in his legs.

R. 277. The ALJ asked the VE whether this hypothetical individual (who also possessed all transferable skills from Jarvis' previous jobs as a mechanic or driller) would be able to perform any light or sedentary skilled jobs. *Id.* The VE responded that Jarvis could perform several jobs, including

-38-

electronics assembler (light semi-skilled work), surveillance system monitor (sedentary unskilled work), maintenance service dispatcher (sedentary, semi-skilled), products checker (light semi-skilled work). R. 277-78. The VE further testified that all of these jobs exist in significant number in the national and local economies. *Id.*

In sum, the ALJ hypothesized an individual who could perform light work and did not include any of the limitations expressed by Dr. Creamer in his medical source statement. As discussed earlier, however, the ALJ did not articulate good cause for rejecting Dr. Creamer's opinions as to limitations.

It is also problematic that the VE was unable to describe how long a worker would have to remain seated to perform the jobs that he described. The ALJ's RFC finding and hypothetical question to the VE described a claimant who could not sit for more than an hour, and required the option to stand at least once an hour. R. 18, 277. After the VE listed the jobs that the claimant could perform, the attorney asked the VE how long the claimant would have to remain seated at the unskilled sedentary jobs. R. 278. The VE responded:

> **It depends on the task**. There are some with various components that electronic people do. They [may be] sitting for a half hour and then they [may be] required to stand up for 20 minutes to get your supplies or maybe to go to another table. There's people that operate, for example, PC boards. They can sit or stand, you know, in a high stool. **So I would say it alternates. There's not really a solid classification.**

R. 278-79 (emphasis added). The VE's answer avoided the question.

Contrary to an earlier response, the VE also testified that limitations in the ability to walk and sit might affect the claimant's ability to perform the light work jobs he listed. The ALJ's hypothetical question described a person who could walk for ten to fifteen minutes, but then had to rest. R. 277. In his decision, the ALJ found that Jarvis was able to walk for ten to fifteen minutes. R. 18, Finding

-39-

6. Jarvis' attorney asked the VE whether an inability to walk on a sustained basis, and the inability to sit for less than six hours in an eight-hour day, would significantly impact the hypothetical claimant's ability to perform the light work jobs that the VE had identified.  R. 283.  The VE answered: "Yes.  Depending upon how much walking you would have to do because the implication is a little bit more walking than sitting."  *Id.*

Even assuming the ALJ's hypothetical question accurately captured Jarvis' limitations, the VE's subsequent answers cast doubt on whether the individual described can perform the jobs mentioned.  The Commissioner failed to develop a full record regarding the vocational opportunities available to Jarvis, and the VE's testimony did not provide sufficient support for the ALJ's determination.  Accordingly, the Commissioner failed to meet her burden of proving that other jobs exist in the national economy that Jarvis can perform.

### 3.   Jarvis' Pain Testimony and the ALJ's Credibility Finding

Jarvis claims that the Commissioner erred by improperly evaluating Jarvis' complaints of pain and by failing to correctly apply the Eleventh Circuit's "pain standard."  Docket No. 20 at 17-18.  The Commissioner argues that she properly evaluated Jarvis' complaints of pain, and properly applied the relevant legal standards for evaluating pain testimony.  Docket No. 21-1 at 11-14.  Jarvis also argues that the ALJ improperly found Jarvis' testimony to be "not totally credible."  Docket No. 20 at 18-20.  The Commissioner argues that the ALJ made a proper credibility finding.  Docket No. 21-1 at 11-14.

After comparing Jarvis' subjective complaints and symptoms to the other record evidence, including Jarvis' testimony about his daily activities, the ALJ found that Jarvis' "allegations and subjective symptoms are out of proportion and inconsistent with the medical evidence and are not fully

credible." R. 15. The ALJ applied the correct pain standard, and decided not to fully credit Jarvis'

allegations of disabling pain. The Court will not disturb a clearly articulated credibility finding with

substantial supporting evidence in the record. Of course, the Commissioner is free to re-evaluate

credibility issues on remand if she so desires.

**VI.    CONCLUSION**

This case is therefore **REMANDED** to the Commissioner pursuant to Sentence Four to allow

the Commissioner to reevaluate the evidence, to explain the basis for her decision, and to hold such

further proceedings as she may be advised. The Clerk shall enter judgment in favor of Plaintiff and

close the case.

**DONE AND ORDERED** this 16th day of September, 2006.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL              33602

-41-

The Honorable Theodore S. Haynes
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL            32817